In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-3488

AMERICAN BOTTOM CONSERVANCY,

*Plaintiff-Appellant*,

*v.*

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 09-cv-603-GPM—**G. Patrick Murphy**, *Judge*.

ARGUED APRIL 15, 2011—DECIDED JUNE 14, 2011

Before POSNER and MANION, *Circuit Judges*, and
LEFKOW, *District Judge*.[*]

POSNER, *Circuit Judge*. The "American Bottom" is a 175-square-mile floodplain of the Mississippi River in southwestern Illinois, across the river from St. Louis. The area

_____

[*] Hon. Joan Humphrey Lefkow of the Northern District of
Illinois, sitting by designation.

contains wetlands (water-saturated soil) that provide habitat for many different species of birds, butterflies, and other wildlife. The American Bottom Conservancy is an environmental organization that seeks to preserve the wetlands. Its members include birdwatchers and other people who enjoy seeing wildlife in the wild.

Waste Management of Illinois, Inc., owns and operates a landfill in the American Bottom that it calls the "Milam Recycling and Disposal Facility." The landfill, located near the town of Madison, Illinois, is due east of St. Louis and southwest of a state park that contains a large lake—the largest in Illinois, after Lake Michigan. It is called Horseshoe Lake because of its shape (see the first map at the end of this opinion; the maps, though based on the record, are approximations).

Because the Milam landfill is filling up with waste from St. Louis, Waste Management wants to build another landfill—the "North Milam Recycling and Disposal Facility"—on 180 acres of a 220-acre tract ("North Milam") that it owns just north of the Milam RDF; the tract is thus located between that landfill and the state park. The shortest distance from the site of the proposed new landfill to the park's southern boundary is between a quarter of a mile and half a mile.

The 220-acre tract contains five wetland areas. Almost all of them are in the center and northern parts of the tract, about half a mile from the southernmost part of the state park; and that is the part to which bird- and other wildlife-watchers gravitate because it's away from the park's picnic tables and other clutter, which are

near the lake. (The clutter is marked with Xs on the first map.)

Obtaining permission to build a new landfill, and building it, will take time. In the meantime Waste Management wants to remove the soil from some of the wetlands and transport it to its existing landfill to cover layers of waste as they are piled atop that landfill ("daily cover," as this layering is called). The consequence will be to transform the wetlands into a dry "borrow pit."

The wetlands occupy 26.8 acres of the tract and Waste Management wants to destroy 18.4 of them (69 percent). But to destroy wetlands it needed a permit from the Army Corps of Engineers. 33 U.S.C. §§ 1311(a), 1344(a), 1362(7); 40 C.F.R. § 230.3(s)(7). The Corps granted the permit on condition that Waste Management create double the amount of wetlands on a nearby tract that it owns that we have marked as the "proposed mitigation area" on the second map. The company accepted the condition.

Once the existing landfill reaches capacity, Waste Management wants to replace it with the new landfill that it seeks to build in the North Milam tract. The Corps of Engineers doesn't authorize landfills. To build the North Milam landfill, Waste Management needs the permission of the Illinois Environmental Protection Agency. 415 ILCS 5/21(d), 5/39(a); 35 Ill. Admin. Code §§ 807.201, 807.202(a); *Community Landfill Co. v. Pollution Control Board*, 772 N.E.2d 231, 234 (Ill. App. 2002). The company applied for that permission fifteen months

after it had applied to the Corps for the permit to destroy the 18.4 acres of wetlands. Apparently the landfill would not require the destruction of additional wetlands; otherwise Waste Management would have applied for a broader permit.

The application for permission to build the new landfill is pending. But Waste Management won't have to—and won't—wait for it to be granted before destroying the wetlands, since it has to do that anyway in order to obtain daily cover for its existing landfill. American Bottom Conservancy brought this suit to invalidate the permit granted by the Corps of Engineers. The court dismissed the suit without prejudice on the ground that the Conservancy had not established standing to sue under Article III of the Constitution and therefore the suit did not invoke the district court's jurisdiction. The only issue before us is the Conservancy's standing.

Some of the most frequently mentioned grounds for the constitutional doctrine of standing are tenuous, such as that it is derived from Article III's limitation of the federal judicial power to "Cases" and "Controversies," *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 273-75 (2008); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998); *D.L.S. v. Utah*, 374 F.3d 971, 974 (10th Cir. 2004); or from the practice of the English royal courts, on which the federal judiciary was modeled, as argued by Justice Frankfurter, concurring in *Coleman v. Miller*, 307 U.S. 433, 460-61 (1939), and in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 150-51 (1951); see Bradley S. Clanton, "Standing and the

English Prerogative Writs: The Original Understanding," 63 *Brooklyn L. Rev.* 1001, 1031-32 (1997); or from fear that lawsuits wouldn't be vigorously litigated, with the requisite adverseness, unless they involved "tangible" stakes. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *Baker v. Carr*, 369 U.S. 186, 204 (1962); *O'Sullivan v. City of Chicago*, 396 F.3d 843, 853, 868 (7th Cir. 2005); *Comite de Apoyo a los Trabajadores Agricolas (CATA) v. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993).

All three of these grounds have been subjected to strong criticisms by reputable scholars. On whether standing can be grounded in limitations implicit in Article III's case or controversy requirement see 13A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3531.1, pp. 56-57 (3d ed. 2008); Robert J. Pushaw, Jr., "Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts," 69 *Notre Dame L. Rev.* 447, 512-17 (1994); Steven L. Winter, "The Metaphor of Standing and the Problem of Self-Governance," 40 *Stan. L. Rev.* 1371, 1376-77 and n. 26, 1418-25 (1988). On whether it can be grounded in the practice of English royal courts and early American courts see *id.*; Louis L. Jaffe, "Standing To Secure Judicial Review: Public Actions," 74 *Harv. L. Rev.* 1265, 1270 (1961) ("I have encountered no case before 1807 in which the standing of the plaintiff is mooted, though the lists of cases in the digests strongly suggest the possibility that the plaintiff in some of them was without a personal interest"); Raoul Berger, "Standing to Sue in Public Actions: Is It a Constitutional Requirement?," 78 *Yale L.J.* 816, 827 (1969).

And on whether it can be grounded in fear that parties without a tangible stake would litigate with insufficient energy see 13A Charles Alan Wright et al., *supra*, § 3531.3, pp. 126-28; Abram Chayes, "The Supreme Court, 1981 Term—Foreword: Public Law Litigation and the Burger Court," 96 *Harv. L. Re*v. 4, 24-26 (1982).

This isn't to say that the doctrine of standing isn't well grounded. But the solidest grounds are practical (just like the avowedly prudential grounds for judge-made supplements to the Article III standard, *MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742, 744-46 (7th Cir. 2007)). The doctrine is needed to limit premature judicial interference with legislation, to prevent the federal courts from being overwhelmed by cases, and to ensure that the legal remedies of primary victims of wrongful conduct will not be usurped by persons trivially or not at all harmed by the wrong complained of. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, *supra*, 454 U.S. at 473; *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991); Daniel E. Ho & Erica L. Ross, "Did Liberal Justices Invent the Standing Doctrine? An Empirical Study of the Evolution of Standing, 1921-2006," 62 *Stan. L. Rev.* 591, 597-99, 604-07 (2010); Richard H. Fallon, Jr., "The Linkage Between Justiciability and Remedies—And Their Connections to Substantive Rights," 92 *Va. L. Rev.* 633, 673-74 (2006); Cass R. Sunstein, "What's Standing After *Lujan*? Of Citizen Suits, 'Injuries,' and Article III," 91 *Mich. L. Rev.* 163, 179-80 (1992). "During the twentieth century, courts became self-conscious about the concept of standing only after developments in the legal culture

subjected the private law model to unfamiliar strains." Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts and the Federal System* 114 (7th ed. 2009).

Consistent with the practical as well as doctrinal thinking behind the requirement of standing, a plaintiff, to establish Article III standing to sue, must allege, and if the allegation is contested must present evidence, that the relief he seeks will if granted avert or mitigate or compensate *him* for an injury—though not necessarily a great injury—caused or likely to be caused by the defendant. E.g., *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Imagine an environmental group located in California suing to prevent the Corps of Engineers from granting a permit to destroy wetlands at the North Milam site even though no member of the group planned ever to visit the American Bottom. The suit might be brought before American Bottom Conservancy brought its own suit and the Conservancy's suit might be overshadowed by the suit by the California group, even though the Conservancy's members have a greater stake because they actually frequent the Horseshoe Lake State Park and will feel the diminution in their birdwatching and other wildlife-viewing activities directly if the wetlands are destroyed.

The magnitude, as distinct from the directness, of the injury is not critical to the concerns that underlie the requirement of standing; and so denying a person who derives pleasure from watching wildlife of the opportunity to watch it is a sufficient injury to confer standing. *Friends of the Earth, Inc. v. Laidlaw Environmental*

*Services (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Lujan v. Defenders of Wildlife*, *supra*, 504 U.S. at 562-63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 925-26 (7th Cir. 2008) ("[McKasson] explains that every other year since 1987, [she] and her family have taken trips to fish, kayak, camp, and enjoy the natural beauty and clean environment of Rend Lake, located three miles from the proposed plant site. She claims if the Company builds the plant under the 2001 permit, she will cease her biennial recreational trips because the pollutants emitted based on the permit will harm her and diminish her aesthetic enjoyment of Rend Lake"); *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1029-31 (D.C. Cir. 2008) (per curiam); *Cantrell v. City of Long Beach*, 241 F.3d 674, 680 (9th Cir. 2001) ("the birdwatchers have demonstrated a sufficiently concrete interest to establish an injury in fact under the test set forth in *Laidlaw*").

The Conservancy submitted to the district court affidavits from three of its members who frequent the state park and enjoy watching birds and other wildlife there, and neither the Corps nor Waste Management, which the Conservancy joined as an additional defendant, question the truthfulness of the affiants' description of their tastes and activities. Nor did either defendant submit any evidence relating to standing—and indeed the Corps did not question standing in the district court, though that of course is not a forfeiture.

When they're at the southern end of the state park, the affiants see wildlife, mainly birds (many different species) and butterflies, both in and near the park. They assert that the destruction of 18.4 acres of wetlands near the south end of the park will diminish the wildlife population visible to them and therefore their enjoyment of wildlife, and that it will be many years before the wetlands created by Waste Management in the mitigation area will develop to a point at which they provide an equivalent wildlife habitat. Much of the current bird and butterfly population will, if and when the current wetlands are destroyed, either migrate elsewhere, in which event they will no longer be within the visual field of the affiants, or die. They are unlikely to hang around for years waiting for the re-creation of their habitat in a different place.

True, the plaintiff's affidavits don't say that the birds and butterflies whose habitats are in the wetlands that are slated for destruction fly into or over the state park, or that birds and other wildlife that live in and fly over the wetland acres can be seen from the park. But birds that nest in the wetlands or resort there for food or water do not just hover over the wetlands. They fly all over the place, doubtless including the park, which is only half a mile from the wetlands. It's not as if the Conservancy were suing to preserve wetlands in Arkansas on the ground that birds whose habitats are in those wetlands sometimes fly over Horseshoe Lake State Park. See *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 741-42 (7th Cir. 2009); cf. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir. 2011).

Proximity distinguishes this case from that and also from our other hypothetical case, that of the California environmental group. See *Lujan v. Defenders of Wildife, supra*, 504 U.S. at 563-64; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376-78 (1982); *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006); *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 55 (1st Cir. 2001).

The district judge thought that to establish standing the affiants had to attest that they would be so upset by the diminution in their bird- and wildlife-watching activities that they would no longer visit the state park. That is wrong; it is enough to confer standing that their pleasure is diminished even if not to the point that they abandon the site. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., supra*, 528 U.S. at 183, *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972); *Heartwood, Inc. v. United States Forest Service*, 230 F.3d 947, 951 (7th Cir. 2000). For that diminution is an injury.

The judge noted disapprovingly that the affiants express more anxiety about the planned North Milam landfill than about the preceding destruction of the wetlands to create a borrow pit and that they allege injuries, such as the bad odors likely to be generated by the landfill if it is built, that the mere destruction of the wetlands would not cause. This is not a valid ground for rejecting the Conservancy's standing. Although it is not certain that Waste Management will obtain the required permit from the Illinois Environmental Protection Agency to build the North Milam landfill unless the Corps of Engineers' permit is voided, it must be

likely, for Waste Management must have spent a great deal of money designing the landfill, obtaining the Corps of Engineers permit (plus another permit it needed, from the City of Madison, called "local siting approval," 415 ILCS 5/39(c), 39.2; *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 866 N.E.2d 227, 230 (Ill. 2007)), and prosecuting its permit application before the IEPA—and it will need not just one IEPA permit but separate permits from the agency's Bureaus of Land, Air, and Water. See Illinois Environmental Protection Agency, "Nonhazardous Solid Waste Management and Landfill Capacity in Illinois: 2009," p. 11 (April 2011), www.epa.state.il.us/land/landfill-capacity/2009/report.pdf (visited May 31, 2011).

If American Bottom Conservancy can prevent the wetlands' destruction by knocking out the Corps of Engineers permit, there will be no North Milam landfill. And so a judgment in the plaintiff's favor in the present lawsuit would eliminate a probable injury from the landfill. No more is necessary to establish standing. *Massachusetts v. EPA*, 549 U.S. 497, 525-26 and n. 23 (2007); *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998); *Village of Elk Grove Village v. Evans*, 997 F.3d 328, 329 (7th Cir. 1993) ("even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability," quoted approvingly in *Massachusetts v. EPA, supra*, 549 U.S. at 525 n. 23); see also *Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 284-85 (1st Cir. 2006); *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228,

1235-36 (D.C. Cir. 1996). "A suit to redress an injury to the plaintiff is a 'case' or 'controversy' within the meaning that the courts have imprinted on these words of Article III of the Constitution, as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress. As we have noted repeatedly, the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." *MainStreet Organization of Realtors v. Calumet City*, *supra*, 505 F.3d at 744.

It is true that the district court (or this court) might well hold that any bad effects of the landfill are not a ground for invalidating the permit granted by the Corps of Engineers, because the Corps was not required to consider such effects in deciding whether to grant the permit. *Department of Transportation v. Public Citizen*, 541 U.S. 752, 764, 767-68, 770 (2004); *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 196-97 (4th Cir. 2009); *City of Shoreacres v. Waterworth*, 420 F.3d 440, 451-52 (5th Cir. 2005). But that would be a ruling on the merits rather than on whether a probable injury to the Conservancy's members caused by a landfill located less than a mile from the state park would be averted were the permit invalidated. But cf. *GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1111-12 (D.C. Cir. 2005).

Anyway it doesn't matter whether the plaintiff has standing to challenge the Corps' permit on the basis of the incremental effects of a proposed new landfill that may never be built. The affiants want the 18.4 acres of

wetlands preserved, and they will be preserved if the Corps' permit is voided but destroyed if it is not.

The judge deemed "merely speculative" the contention that destruction of the wetlands would, as stated in one of the affidavits, "reduce the number and variety of birds, butterflies, other insects, snakes and amphibians that [the affiant] frequently observes around Horseshoe Lake." The judge said that the contention "disregards the fact that 31% of the subject wetlands will be . . . preserved $[1 - 18.4/26.8 = .31]$ and that nearly twice the amount of affected wetlands will be created in mitigation." The reference to the amount of wetlands that will be preserved is beside the point, as is the remark about mitigation because by the time the new wetlands reach maturity and provide habitat for wildlife the affiant may be dead of old age. Animals migrate to areas rich in food and water, crowding the area until the supply of nutrients is stretched to the point where it cannot support any more animals. If a habitat is reduced in size by more than two thirds, the supply of nutrients will be reduced by roughly that fraction and many of the animals will leave, starve to death, or fail to reproduce. Butterflies rarely live more than six weeks; given their short lifespans and limited range, destroying a small area of wetland could destroy a butterfly population very quickly.

Most animals whose habitat in the 18.4 acres of wetland was destroyed would not be able to relocate to the proposed mitigation area because about 80 to 85 percent of the area is treeless—and birds and other wildlife need

shelter as well as food. They can't wait for newly planted trees in the mitigation area to mature. As one affiant explains, "Some bird species nest in all trees, other birds nest in understory trees and shrubs, and some nest on the ground . . . . Yellow-throated Warbler, Northern Parula, and Cerulean Warbler nest in tall sycamores. Other species that nest in tall, mature trees include Baltimore Orioles, Orchard Orioles, Summer Tanager, Scarlet Tanager, Yellow-billed Cuckoo, Red-eyed Vireo, White-eyed Vireo, Warbling Vireo, Yellow Warbler, Blue-gray Gnatcatcher, Tufted Titmouse, and Eastern Kingbird. These species could nest at various levels within a tall tree but the maturity of the tree means that there are many branches which offer protection; the leaves and fullness of the tree keep the nests from being seen."

Since Waste Management has committed to creating twice the wetlands that it will destroy, maybe, despite the probable delay in their developing to the point at which they will provide habitat comparable to what is to be destroyed, the permit granted by the Corps of Engineers is actually a boon to the environment. But that is a question that goes to the merits of the Conservancy's challenge to the Corps; it does not detract from the injuries to the Conservancy's current members, who presented uncontradicted evidence that they will lose present enjoyment of wildlife if the existing wetlands are destroyed.

It might seem that 18.4 acres of wetlands would be so small a fraction of the wetlands in the vicinity of the park that their elimination would not reduce the wildlife population seen by visitors by a perceptible

amount. But some of the species that dwell in the wetlands have a limited range (we mentioned butterflies) and so would be unlikely to wander from a farther distance to the state park or its vicinity. And much of the American Bottom is urbanized, and we know that only a little more than 10 percent of the tract designated for the North Milam landfill consists of wetlands and that south of that proposed landfill, at no great distance, is another landfill, the Milam RDF, though its days may be numbered. The extent of wetlands that provide good habitat for wildlife within range of Horseshoe Lake State Park may be quite limited. Anyway the plaintiff's affidavits claim that the destruction of the 18.4 acres of wetlands will reduce the amount of perceptible wildlife, and the claim is not so implausible that it can be rejected without counteraffidavits, which Waste Management has not submitted. And if a really substantial elimination of wildlife were required to establish standing, a cumulatively immense elimination of wildlife could occur as a result of numerous small projects requiring destruction of wetlands, none of which would create an injury great enough to support standing if such a requirement were imposed. See *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 and n. 8 (3d Cir. 1990); Emily Longfellow, "*Friends of the Earth v. Laidlaw Environmental Services*: A New Look at Environmental Standing," 24 *Environs Environmental L. & Pol'y J.* 3, 15 (Fall 2000); Richard J. Lazarus, "Restoring What's Environmental About Environmental Law in the Supreme Court," 47 *UCLA L. Rev.* 703, 745-47 (2000).

One point remains to be addressed. Waste Management (but not the Corps of Engineers) requests that in the

event we find standing (as we have just done), we should nevertheless uphold the judgment of the district court on the alternative ground that the court, had it not decided the case on the basis of lack of standing, should have granted summary judgment in favor of the defendants—that is, have decided the merits in their favor. The request is improper. The district court dismissed the suit without prejudice, because on the view it took of standing it had no jurisdiction; it therefore could only dismiss without prejudice. Were we to decide the case on the merits we would be directing the entry of judgment with prejudice; otherwise the plaintiff would be free to relitigate the case. An appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed, in this case from a dismissal without to a dismissal with prejudice, must file a cross-appeal, *Greenlaw v. United States*, 554 U.S. 237, 244-45 (2008); *Kamelgard v. Macura*, 585 F.3d 334, 336 (7th Cir. 2009); *Figueroa v. Rivera*, 147 F.3d 77, 81 (1st Cir. 1998). Waste Management didn't do so.

The judgment is reversed with instructions to reinstate the suit.

REVERSED.

MAP OF STATE PARK AND LANDFILL SITES



DETAILED MAP OF PROPOSED LANDFILL SITE

