CALIFORNIA SEA URCHIN COMMISSION, et al., Plaintiffs,

v.

Michael BEAN, in his official capacity as Principal Deputy Assistant Secretary for Fish & Wildlife & Parks, U.S. Department of the Interior, et al., Defendants,

and

Friends of the Sea Otter, et al., Intervenor–Defendants,

and

The Otter Project, et al., Intervenor–Defendants.

Case No. CV 13–5517–DMG (CWx).

United States District Court, C.D. California.

Signed 03/03/2017

Damien M. Schiff, Jonathan Wood, Johanna Beth Talcott, M. Reed Hopper, Pacific Legal Foundation, Sacramento, CA, for Plaintiffs.

Alison C. Finnegan, U.S. Department of Justice, Washington, DC, for Defendants.

Donald C. Baur, pro hac vice, Perkins Coie LLP, Washington, DC, Andrea Arnold Treece, George M. Torgun, Irene V. Gutierrez, Earthjustice, San Francisco, CA, Charles H. Samel, Perkins Coie LLP, Los Angeles, CA, Donald B. Mooney, Donald B. Mooney Law Offices, Davis, CA, for Intervenor–Defendants.

### ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT [93, 99, 101]

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

Plaintiffs are four trade groups representing fishermen who fish near San Nicolas Island. They ask the Court to hold unlawful and set aside action of the Fish and Wildlife Service ("FWS") which,

among other things, eliminated a regulation immunizing fishermen who accidentally harm California sea otters in this area. Intervenor–Defendants are seven non-profit organizations that share an affinity for marine mustelids. On November 11, 2016, Plaintiffs filed a motion for summary judgment. On December 16, 2016, the FWS and Intervenor–Defendants filed cross-motions.

## I. BACKGROUND

The facts and procedural background to this case are set forth at *Cal. Sea Urchin Commission v. Bean*, 828 F.3d 1046, 1047–48 (2016). What follows is a brief summary. In 1986, Congress enacted Public Law No. 99–625, authorizing the FWS to establish an experimental population of California sea otters on San Nicolas Island (the "Translocation Program" or "Program"). In 1987, the FWS promulgated regulations to implement this statute (the "Translocation Plan" or "Plan"). The Plan provided for the termination of the Program in the event one of several termination criteria materialized. In 2012, the FWS terminated the Program and repealed the Plan pursuant to one of these termination criteria. Plaintiffs objected to this action, because it resulted in the repeal of Plan provisions limiting their liability under the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA"). Plaintiffs filed this suit in 2013, arguing that the FWS's inclusion of termination criteria in the Plan was unlawful.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the parties agree as to the material facts but dispute the proper interpretation of relevant statutes and regulations, the case is properly resolved at the summary judgment stage. *Smith v. Califano*, 597 F.2d 152, 155 n.4 (9th Cir. 1979).

## III. ANALYSIS

The only merits issue in this case is whether Public Law No. 99–625 prohibits the FWS from terminating the Translocation Plan. Before turning to that issue, however, the Court must decide whether Plaintiffs have standing to challenge the FWS's decision, and if so, whether their challenge is barred for reasons of issue preclusion or estoppel.[1]

### A. Standing

 Standing is a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). If the plaintiff lacks standing to assert a claim, the Court lacks jurisdiction over the claim. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). "To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Because standing is "an indispensable part of the plaintiff's case," the plaintiff must establish standing "with the manner and degree of evidence required at" the relevant stage of the litigation. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. At the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts" that, if true, would establish its standing. *Id.* Factual disputes are resolved in the plaintiff's favor. *Id.*

---

1. The FWS has abandoned its laches argument. [Doc. # 104 at 27 n.18.]

Plaintiffs present two theories of standing. First, Plaintiffs argue that they have standing because they are the objects of the regulations being challenged. A plaintiff is generally presumed to have standing "to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (citing *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130). This is so because there is rarely any doubt that a regulation will have a concrete, immediate effect on the parties subject to regulation. *Id.* Where the regulation's effect on the plaintiff is not self-evident, however, a plaintiff cannot establish standing simply by characterizing itself as a regulated party. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) ("[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement."). Rather, the plaintiff must show that it faces an *appreciable* risk of incurring liability as a result of the challenged regulation. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To determine whether such a risk exists, courts consider three factors: (1) whether the plaintiff has a concrete plan to engage in activities that are likely to result in liability under the challenged law; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006).

This is not a case where it is self-evident that Plaintiffs will suffer a concrete, immediate injury as a result of the challenged regulations. The FWS's decision to repeal the Translocation Plan did not impose any regulatory burdens on Plaintiffs. It simply eliminated an exemption from liability under the ESA and MMPA. To show concrete, immediate harm, Plaintiffs must show that they face an appreciable risk of liability due to the elimination of this exemption.

To establish such a risk, Plaintiffs offer six declarations from fishermen who work in the management zone. The declarants generally express their concern about incurring liability under the ESA and MMPA. [*See, e.g.,* Doc. # 93–3, ¶ 8.] One declarant named Michael Harrington states that he has "personally seen sea otters in areas where sea urchin are harvested," and expresses concern that he could be subject to liability if he "accidently disturb[s] ... or get[s] too near an otter." [Doc. # 93–5, ¶ 24.] Harrington further states that "some types of fishing" cannot be performed in areas where sea otters are present. [*Id.*, ¶ 23].

These declarations do not identify an injury that is "concrete, particularized, and actual or imminent." *Davis*, 554 U.S. at 733, 128 S.Ct. 2759. The declarants' generalized concerns about incurring liability do not give rise to a cognizable injury. *See Thomas*, 220 F.3d at 1139. Nor are Harrington's statements sufficiently particularized to indicate that he has suffered an injury. Harrington does not indicate how many times he has seen sea otters while on the job, how close they were to his work area, or whether he has ever had to leave a fishing site for fear of interfering with the otters. Harrington does not explain which fishing methods are inherently disruptive to otters; nor does he indicate that he uses these methods. Plaintiffs have not presented evidence establishing that they engage in activities that are likely to result in liability if the exemption is not reinstated.[2]

**2.** FWS, on the other hand, submits evidence

suggesting that "[d]ive fisheries (sea urchin,

Plaintiffs fail entirely to address the other two *Sacks* factors. They offer no evidence that the government has ever issued a "specific warning or threat" to initiate civil or criminal proceedings against fishermen who accidentally disturb otters.[3] Nor do Plaintiffs present evidence that the ESA or the MMPA have ever been used to prosecute fishermen engaged in the types of activities at issue here. Plaintiffs have not satisfied any of the *Sacks* factors. Their first theory of standing fails.

■ Plaintiffs' second theory of standing is that the FWS's decision to terminate the Translocation Plan threatens Plaintiffs' interest in robust, sustainable fisheries. Plaintiffs submit declarations from fishermen stating that "[s]ea otters have significantly reduced shellfish populations along the coastline." [*See, e.g.*, Doc. # 93–6 ¶ 5.] One fisherman states that nearly half of his income used to come from harvesting along the coastline, but that he is no longer able to harvest there due to otter predation. [Doc. # 93–7, ¶ 6.] Another fisherman states that otters "decimated" the Coho Anchorage kelp bed, which was once a prime location for sea urchin and shellfish harvesting. [Doc. # 93–6, ¶ 6].

The FWS does not dispute that this evidence establishes cognizable injury-in-fact. Instead, the FWS argues that Plaintiffs cannot establish redressability, because even if Plaintiffs succeed in having the Translocation Plan reinstated, the FWS would not be required to relocate otters unless it identified a "feasible, nonlethal" method for doing so, which is unlikely, as the agency has already determined that no such method exists.

Plaintiffs counter that a favorable verdict would at least require the FWS "to make ongoing efforts to develop feasible, nonlethal means of capturing and transporting otters." [Doc. # 103 at 12.]

■ The Court concludes that Plaintiffs have satisfied the redressability requirement. The redressability requirement does not require a plaintiff "to solve all roadblocks simultaneously;" rather, a party may seek "to tackle one roadblock at a time." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012). That is especially true when the harm complained of is environmental. Given the complexity of the natural world and the innumerable ways in which human activities affect the environment, it is rarely possible to say with certainty that a particular verdict will resolve a particular environmental harm. Often, environmental harm will result indirectly from human activity, occurring later in time or some distance away from the activity that caused it, or after some intermediate natural process. *See* Patrick Gallagher, *Environmental Law, Clapper v. Amnesty International, USA and the Vagaries of Injury-in-Fact*, 32 UCLA J. ENVTL. L. & POL'Y 1, 34 (2014) (citing 40 C.F.R. § 1508.8). Environmental harm may also result from "cumulative impacts," i.e., impacts "'which result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions....'" *Id.* (quoting 40 C.F.R. § 1508.7).

■ Rather than shut the courthouse doors to real environmental harms, courts have adopted a practical construction of

---

abalone) are *extremely unlikely* to result in take of sea otters by virtue of the methods they employ to harvest shellfish." [AR 38:5500 (emphasis added).]

3. As Plaintiffs note, the ESA includes a citizen suit provision, whereby "any person may commence a civil suit on his own behalf ... to enjoin any person ... who is alleged to be in violation of" the ESA. 16 U.S.C. § 1540(g). Plaintiffs have not identified any citizens group that has threatened to initiate such an action.

Article III's case-or-controversy-requirement that allows a plaintiff to maintain an action if it is likely that a favorable verdict will constitute a meaningful step towards remedying the alleged harm. For example, in *American Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652 (7th Cir. 2011), the Seventh Circuit held that an environmental organization had standing to challenge the destruction of the 18.4 acres of wetlands adjoining a state park based on its members' interest in enjoying wildlife at the park. *Id.* at 657. Notwithstanding the small size of the habitat in question, Judge Posner found redressability, explaining that "[i]f a really substantial elimination of wildlife were required to establish standing, a cumulatively immense elimination of wildlife could occur as a result of numerous small projects requiring destruction of wetlands, none of which would create an injury great enough to support standing if such a requirement were imposed." *Id.* at 660.

Similarly, in *Massachusetts v. EPA*, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the Supreme Court held that Massachusetts had standing to challenge EPA's denial of a petition for rulemaking which asked the agency to regulate greenhouse gas emissions from new motor vehicles. A favorable verdict would not automatically result in regulation of these emissions; rather, regulation would only occur if the agency made a finding that these emissions " 'cause[d], or contribut[e]d] to, air pollution which may reasonably be anticipated to endanger public health or welfare.' " *Id.* at 532–33, 127 S.Ct. 1438 (quoting 42 U.S.C. § 7521(a)(1)). Moreover, even if EPA did ultimately make an endangerment finding and pro-

ceed with regulation, this "w[ould] not by itself reverse global warming." *Id.* at 525, 127 S.Ct. 1438. Nonetheless, the Court found redressability because the risk of environmental harm "would be reduced *to some extent* if petitioners received the relief they seek." *Id.* at 526, 127 S.Ct. 1438 (emphasis added).[4]

 This case is very similar to *Massachusetts*. A favorable verdict for Plaintiffs will not require the FWS to take immediate action to remedy Plaintiffs' injury, but it will require the agency to make an inquiry into whether such action is possible. In *Massachusetts*, a favorable verdict would require EPA to determine whether greenhouse gases endangered public health; here, a favorable verdict would require the FWS to revisit its determination that there is no feasible, nonlethal means of capturing sea otters. The FWS argues that it is likely to come to the same conclusion if it conducts a new inquiry. But if a plaintiff is entitled to insist on certain proceedings, an agency cannot defeat standing by arguing that the outcome of the proceedings is predetermined. *Cf. Lujan*, 504 U.S. 555, 573 n.7, 112 S.Ct. 2130 ("one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered").

Accepting Plaintiffs' factual submissions as true, as it must at the summary judgment stage, the Court concludes that reinstatement of the Translocation Plan would constitute a meaningful step towards remedying harm to the fisheries where Plain-

---

4. *Compare Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (Plaintiffs may establish redressability by showing "that there would be a change in a legal status as a consequence of a favorable decision and that

a practical consequence of that change would amount to a significant increase in the likelihood that [they] would obtain relief that directly redresses the injury suffered.").

tiffs fish. Plaintiffs have borne their burden to establish standing.

### B. Estoppel

 The FWS argues that Plaintiffs are estopped from arguing that the Public Law No. 99–625 prohibits the FWS from terminating the Translocation Plan. The FWS points to the California Abalone Association's comments on the 1987 Rule, which urged the FWS to include termination criteria in the Translocation Plan. The FWS also points to a consent decree signed in 2010 by California Abalone Association and California Sea Urchin Commission, which required the FWS to carry out a rulemaking applying the termination criteria.

Even assuming California Abalone Association and California Sea Urchin Commission are estopped from arguing that the termination criteria are invalid, there are two other Plaintiffs in this case—California Lobster and Trap Fishermen's Association and Commercial Fishermen of Santa Barbara. The FWS does not explain why these Plaintiffs should be estopped from arguing that the termination criteria are invalid.[5] Because the FWS's estoppel argument would not be dispositive as to all of the Plaintiffs, the Court declines to address it.

### C. Issue Preclusion

On February 13, 2017, the Court ordered supplemental briefing on whether Hon. John F. Walter's decision in Case No. CV14–8499–JFW (CWx) had issue preclusive effect in this case. [Doc. # 106.] Among other arguments, Plaintiffs assert that issue preclusion does not apply because one of the Plaintiffs in this case, the California Lobster and Trap Fishermen's Association, was not a party to the proceeding before Judge Walter. Plaintiffs

have not provided any evidence to support this organization's standing, and even if the organization has standing, preclusion might lie if a unity of interests exists between California Lobster and Trap Fishermen's Association and the other Plaintiffs. *See United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008). Nonetheless, the Court concludes that the better course is to address the merits of this dispute, relying on Judge Walter's decision merely as persuasive authority.

### D. Merits of Plaintiffs' Claim

 In an action under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action ... found to be ... in excess of statutory jurisdiction, authority, or limitations...." 5 U.S.C. § 706(2)(C). In deciding whether an agency action is *ultra vires*, courts apply the framework set forth in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 133 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013) ("a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority"). At step one, the Court employs the traditional tools of statutory construction to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842 & n.9, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. When the statute is silent or ambiguous with respect to the question at hand, the Court will defer to the agency's interpretation if it is "based

---

**5.** Although Plaintiffs have not proffered evidence that California Lobster and Trap Fishermen's Association has standing, they have

submitted a standing declaration from a member of the Commercial Fishermen of Santa Barbara. [Doc. # 93–5].

on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

In pertinent part, Public Law No. 99–625 provides:

> The Secretary may develop and implement, in accordance with this section, a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location. The plan, which must be developed by regulation and administered by the Service in cooperation with the appropriate State agency, shall include the following ... (4) The specification of a zone (hereinafter referred to as the "management zone") that—(A) surrounds the translocation zone; and (B) does not include the existing range of the parent population or adjacent range where expansion is necessary for the recovery of the species. The purpose of the management zone is to (i) facilitate the management of sea otters and the containment of the experimental population within the translocation zone, and (ii) to prevent, to the maximum extent feasible, conflict with other fishery resources within the management zone by the experimental population. Any sea otter found within the management zone shall be treated as a member of the experimental population.

The Service shall use all feasible nonlethal means and measures to capture any sea otter found within the management zone and return it to either the translocation zone or to the range of the parent population.

Public Law No. 99–625, § 1(b).

■ The dispute in this case arises from the fact that section 1(b) uses both mandatory and permissive language. Plaintiffs focus on the mandatory language, arguing that the FWS is prohibited from terminating the Translocation Plan because the statute provides that the Plan "*shall* include" a management zone. [Doc. # 93–1 at 18.] The FWS and Intervenor-Defendants focus on the permissive language, arguing that termination of the Plan is within the FWS's discretion because the statute provides that the agency "*may* develop and *implement*" the Plan. [Doc. ## 99–1 at 30; 101–1 at 20.]

It does not appear to this Court that Congress spoke directly to the question whether the FWS has authority to terminate the Translocation Plan. The language quoted by Plaintiffs does not speak to the question. This language provides that the Plan must include a management zone, but neither requires the FWS to develop the Plan nor prohibits the FWS from repealing the Plan after it is developed.[6]

---

**6.** Nor do the other passages quoted by Plaintiffs speak to the question at hand. Plaintiffs cite (1) language in section 1(b)(4) stating that the FWS "shall" treat any otter found within the management zone "as a member of the experimental population" and "shall use all feasible non-lethal means and measures" to capture and remove them from the zone; and (2) language in section 1(c)(2) stating that "any incidental taking of [an otter] during the course of an otherwise lawful activity within the management zone[ ] may not be treated as a violation of" the ESA or MMPA. This language presupposes the existence of an operative Plan establishing a management zone. It does not require the implementation of such a Plan.

Plaintiffs also cite language in section 1(b) stating that the Plan "must be developed by regulation." This language simply specifies the procedure that must be followed in the event the FWS elects to develop the Plan. It does not derogate from the language appearing earlier in the same subsection stating that the FWS "*may* develop" the Plan.

Finally, Plaintiffs cite language in section 1(d) stating that the FWS "shall implement" the regulation after performing any consultations requested or initiated by April 1, 1986, or if no such consultation "is initiated or requested by April 1, 1986, at any time after that date." This language prohibits the FWS from implementing the Translocation Plan before the completion of consultations requested

On the other hand, the language quoted by the FWS and Intervenor–Defendants speaks generally to the question at hand. If the FWS "may ... implement" the Plan, it follows that the agency may also stop implementing the plan.[7] *Accord Cal. Sea Urchin Comm'n v. Bean,* No. 14-8499-JFW (CWx), 2015 WL 5737899 at *6 (Sept. 18, 2015) ("Because implementing the program is discretionary, the Service had the discretion to both commence and cease implementation of the program."). Even so, this language is too general for the Court to comfortably conclude that Congress spoke directly to the question at hand. Absent language directly on point—language stating that the FWS is or is not authorized to terminate the Translocation Plan—the Court is reluctant to resolve this case at *Chevron* step 1.

Turning to *Chevron* step 2, the Court concludes that the FWS's interpretation of Pub. L. No. 99–625 is reasonable. First, the FWS's interpretation is consistent with the presumption that Congress intends for agencies to have flexibility to modify, or if necessary terminate, regulatory programs that have ceased to serve the intended function. *Accord id.* at *7 (collecting cases). That presumption has special force here, because Congress described the Transloca-

tion Program as "experimental," which implies that Congress understood "the program's success [to be] uncertain and its continuation provisional." *Id.*

Second, the FWS's interpretation is consistent with the structure of the statute, which indicates that Congress intended the FWS to have wide discretion in implementing the Plan in general and the management zone in particular. Strikingly, the statute does not establish a minimum size for the management zone. Although the management zone must "surround" the translocation zone, it is entirely up to the FWS how wide the former shall be.[8] Moreover, the statute provides that the management zone is intended to prevent conflict with other fishery resources "to the maximum extent feasible," and that FWS is required to use "feasible non-lethal means" to capture otters found in the management zone. It appears that Congress wanted the FWS to make reasonable efforts to contain the experimental population (if one was established), but intended the agency to have wide discretion in deciding what efforts were feasible and consistent with the recovery of the species. Such discretion was to be constrained, not by congressional fiat, but by the requirement that the FWS proceed by "rulemak-

---

or initiated by April 1, 1986. It cannot be reasonably construed to impose any other limit on the FWS's authority.

7. Plaintiffs argue that "the phrase 'may develop and implement' pertains only to the Service's discretionary authority to commence the translocation program." [Doc. # 103 at 15.] That argument is unpersuasive. "We must interpret statutes to give effect to all provisions and not render any part surplussage." *United States v. Gonzalez–Monterroso,* 745 F.3d 1237, 1247 (9th Cir. 2014). Plaintiffs' interpretation would deprive the term "implement" of any independent meaning.

8. The statute confers an additional measure of discretion by stating that the management zone shall "surround[] the translocation

zone[] and ... not include the existing range of the parent population or adjacent range where expansion is necessary for the recovery of the species." The meaning of the term "adjacent" is indefinite: it is unclear how far one must go from the "range where expansion is necessary" until one is no longer adjacent to that range. The term is also structurally ambiguous, because it could be read to modify "existing range," "translocation zone," or both. Congress' imprecision constitutes a delegation to the FWS to determine what constitutes "adjacent range where expansion is necessary for the recovery of the species." Any range that the FWS determined was necessary for this purpose would, by operation of the statute, be excluded from the management zone.

ing," subject to traditional administrative law protections against arbitrary or capricious rulemaking.

Finally, the FWS's interpretation is supported by the legislative history. The House Report accompanying Public Law No. 99–625 stated that the FWS should look to regulations under section 10(j) of the ESA "for guidance in evaluating the possible effect of the translocation of the parent population." H.R. Rep. 99–124 at 14, 16 (1985). Those regulations provided for "[a] process for periodic review and evaluation of the success or failure of the release and the effect of the release on the conservation and recovery of the species." 49 Fed. Reg. 33,885, 33,893 (Aug. 27, 1984). The FWS's decision to include termination criteria in the Plan follows the direction provided by the House Report.[9]

Plaintiffs ask the Court to apply the constitutional avoidance canon to reject the FWS's interpretation, arguing that this interpretation would give rise to non-delegation concerns. The Court declines to do so. "The vitality of the nondelegation doctrine is questionable." *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1396 fn.3 (9th Cir. 1995). If the Supreme Court were thinking about reviving the doctrine, it would not

start here. The Translocation Program is of minimal economic significance. Moreover, the FWS's discretion is constrained by the requirement that any action under Public Law No. 99–625 be consistent with the recovery of the species.[10]

In sum, the Court finds that the FWS's construction of Public Law No. 99–625 is a reasonable one and therefore will defer to its interpretation.

## IV. CONCLUSION

In light of the foregoing, the Court will **DENY** Plaintiffs' motion for summary judgment and **GRANT** the FWS's and Intervenor–Defendants' cross-motions.

**IT IS SO ORDERED.**

---

**9.** Although the Court is reluctant to accord much weight to the statement of a single legislator, it notes that in discussing an earlier draft of the legislation, one of the co-sponsors of Public Law No. 99–625 stated: "[i]f the Service determines that the translocation is not successful, it should, through the informal rulemaking process, repeal the rule authorizing the translocation." 131 Cong. Rec. H6486 (daily ed., July 29, 1985).

**10.** Plaintiffs make an additional argument. They note that Congress amended the MMPA in 1994 to modify the Act's requirements with respect to the "incidental taking of marine mammals in the course of commercial fishing operations," but stated that this amendment would "not govern the incidental taking of

California sea otters." 16 U.S.C. § 1387(a)(1), (4). Plaintiffs speculate that Congress exempted California sea otters from this amendment because it expected the management zone established pursuant to Public Law No. 99–625 to remain effective in perpetuity. This argument makes scant sense. The MMPA amendment was enacted five years after the FWS adopted the regulations establishing termination criteria. The Court will not presume that Congress misunderstood these regulations. In any event, Plaintiffs' argument is foreclosed by the plain text of the MMPA amendment, which states that the amendment "shall not be deemed to *amend* or repeal [Public Law No. 99–625]." *Id.* at § 1387(a)(4) (emphasis added).