**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA SEA URCHIN
COMMISSION; CALIFORNIA ABALONE
ASSOCIATION; CALIFORNIA LOBSTER
AND TRAP FISHERMEN'S
ASSOCIATION; COMMERCIAL
FISHERMEN OF SANTA BARBARA,
            *Plaintiffs-Appellants*,

                v.

MICHAEL BEAN, in his official
capacity as Acting Assistant
Secretary for Fish and Wildlife &
Parks, Department of Interior;
DANIEL M. ASHE, in his official
capacity as Director of the United
States Fish and Wildlife Service;
UNITED STATES FISH & WILDLIFE
SERVICE,
            *Defendants-Appellees*,

               and

FRIENDS OF THE SEA OTTER;
HUMANE SOCIETY OF THE UNITED
STATES; DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL
DIVERSITY; THE OTTER PROJECT;
ENVIRONMENTAL DEFENSE CENTER;

No. 14-55580

D.C. No.
2:13-cv-05517-
DMG-CW

OPINION

LOS ANGELES WATERKEEPER,
    *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted May 6, 2016
Pasadena, California

Filed July 12, 2016

Before: Alex Kozinski, William A. Fletcher,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Environmental Law

The panel reversed the district court's dismissal on timeliness grounds of plaintiff commercial fishing groups' complaint alleging that the U.S. Fish and Wildlife Service violated its statutory authority under Public Law 99-625 by terminating a translocation program for the southern sea otter.

The panel held that plaintiffs' challenge, filed in 2013, was timely because the operative agency action challenged was the Fish and Wildlife Service's 2012 promulgation of a rule terminating the translocation program. Specifically, the panel held that plaintiffs may challenge the termination of the program within six years of the *decision* to terminate the program, and were not required to bring suit within six years of the 1987 rulemaking espousing the *authority* to terminate the program. On remand, the panel directed the district court to decide if there was merit to plaintiffs' position that the Fish and Wildlife Service was without Congressional authority to terminate the translocation program.

# COUNSEL

Jonathan Wood (argued) and Damien M. Schiff, Pacific Legal Foundation, Sacramento, California, for Plaintiffs-Appellants.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Rachel Heron (argued), Daniel J. Pollak, John L. Smeltzer, and Vivian H.W. Wang, Attorneys; Sam Hirsch, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Lynn Cox, Office of the Solicitor, United States Department of the Interior; for Defendants-Appellees.

## OPINION

GOULD, Circuit Judge:

Plaintiffs, California Sea Urchin Commission and other commercial fishing groups, appeal the district court's dismissal of their complaint alleging that the U.S. Fish and Wildlife Service (FWS) violated its statutory authority under Public Law 99-625 by terminating a translocation program for the southern sea otter. The district court dismissed the complaint, concluding that it constituted a facial challenge to a 1987 regulation and was thus untimely. Reviewing the dismissal de novo, *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002), we reverse and remand for the reasons that follow.

## I

The southern sea otter, also known as the California sea otter, historically ranged throughout the California coast, but was hunted to near extinction for its fur in the 1700s and 1800s. The southern sea otter was listed as a threatened species under the Endangered Species Act (ESA) in 1977. Although the sea otter's population and range had increased since federal and state bans on hunting in the early 1900s, it was still only about 10% of its historical level at the time of

listing. 52 Fed. Reg. 29,754 (Aug. 11, 1987) ("Final Rule"). In 1982, FWS finalized a recovery plan for the sea otter, which determined that the most effective means of recovery was to establish a new colony far enough away from the present range that a large-scale oil spill could not wipe out the entire population. *Id.*

In 1986, Congress authorized FWS to develop and implement "a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location." Pub. L. No. 99-625 § 1(b) (1986). FWS then promulgated the 1987 Final Rule, which implemented the program and chose San Nicolas Island as the home of the experimental population. 52 Fed. Reg. at 29,754. The fishing industry, including the groups that are Plaintiffs here, was opposed to an expansion of the sea otter population. The fishing industry participated in the rulemaking process and opposed the experimental population because it perceived a new population of sea otters, and their accompanying federal protections under the ESA and the Marine Mammal Protection Act (MMPA), as onerous. Another source of conflict is that sea otters prey on many species that are harvested commercially, including sea urchin, lobster, and abalone. Congress authorized the experimental population on the condition that FWS include an otter "management zone," which would be free of otters, to protect fishing, oil, and military interests. Pub. L. No. 99-625 § 1(b)(4); 52 Fed. Reg. at 29,756. Congress required FWS to use all feasible non-lethal means to capture and remove otters from the management zone "to prevent, to the maximum extent feasible, conflict with other fishery resources." Pub. L. No. 99-625 § 1(b)(4)(B). Fishermen who incidentally harmed otters while conducting lawful activities in the management zone were exempted from the take prohibitions

of the ESA and the MMPA.  Pub. L. No. 99-625 § 1(c)(2).
The management zone covered the entire Southern California
coast from Point Conception to the Mexico border, except for
the experimental population on San Nicolas Island.

The Final Rule acknowledged that there was some chance
the translocation program would not succeed.  To determine
whether the project should be continued or terminated, FWS
included in the Final Rule five termination criteria.[1]  52 Fed.
Reg. at 29,784.  FWS planned to terminate the experimental
population if it found that any one of the criteria was met.  *Id.*

From the start of the translocation program, the
experimental sea otter population was plagued by high
mortality and emigration.  53 Fed. Reg. 37,577, 37,579 (Sept.
27, 1988).  In 1993, FWS stopped removing sea otters that
were found in the management zone, though the ESA and
MMPA exemptions remained in effect.  FWS prepared
several environmental impact statements on the effects of
terminating the program and reinitiated ESA consultation,
culminating in a Biological Opinion concluding that
resumption of otter removal in the management zone would

---

[1] The criteria are: (1) if after the first year, no translocated otters remain
in the translocation zone and the reasons for emigration or mortality
cannot be identified and/or remedied; (2) if within three years, fewer than
25 otters remain and the reason for emigration or mortality cannot be
identified or remedied; (3) if after two years, the experimental population
is declining at a significant rate and the translocated otters are not showing
signs of "successful reproduction"; (4) if otters are "dispersing from the
translocation zone and becoming established within the management zone
in sufficient numbers to demonstrate that containment cannot be
successfully accomplished"; and (5) if the "health and well-being of the
experimental population should become threatened to the point that the
colony's continued survival is unlikely." 52 Fed. Reg. at 29,784.

likely jeopardize the otter's continued existence. 77 Fed. Reg. 75,266, 75,270 (Dec. 19, 2012).

Despite the recognized failures of the translocation program, the management zone's ESA and MMPA take exemptions continued as before. In 2009, Intervenor-Defendants Friends of the Sea Otter and other environmental organizations sued FWS for unreasonable delay in terminating the translocation program. The parties reached a settlement that required FWS to issue a final decision on program termination by the end of 2012. On December 19, 2012, FWS promulgated a rule terminating the program based on application of the Final Rule's termination criteria. 77 Fed. Reg. at 75,266. FWS's analysis concluded that the translocation program met the 1987 Final Rule's second failure criterion: "fewer than 25 otters remain and the reasons for emigration or mortality cannot be identified and/or remedied." *Id.* at 75,267; 52 Fed. Reg. at 29,772.

Plaintiffs filed suit in early 2013, alleging that the program's termination exceeded FWS's statutory authority under Public Law 99-625.[2] Plaintiffs contend that Congress gave FWS the authority only to implement the otter translocation program, not to terminate it, and that Congress did not authorize the termination criteria in the 1987 Final Rule. Thus, Plaintiffs contend, the 2012 program termination exceeded the agency's statutory authority.

---

[2] Plaintiffs separately petitioned FWS to rescind its 2012 decision. FWS denied the petition. Three of four Plaintiffs filed a separate complaint alleging that the denial of the petition was unlawful. That case is not before us. *See Cal. Sea Urchin Comm'n v. Bean*, No. 2:14-cv-8499 (C.D. Cal. filed Nov. 3, 2014).

## II

The Administrative Procedure Act (APA) authorizes judicial review of final agency actions. 5 U.S.C. § 704. APA claims must be brought within six years of the agency action that is challenged. 28 U.S.C. § 2401(a); *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987). To be a final agency action, an agency decision must meet two criteria. First, the action must be the "consummation" of the agency's decisionmaking process, not merely a tentative or interlocutory decision. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Second, the action must be one by which "rights or obligations have been determined" or from which "legal consequences will flow." *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)); *see also City of San Diego v. Whitman*, 242 F.3d 1097, 1102 (9th Cir. 2001) (for an agency action to be final, it must "impose an obligation, deny a right or fix some legal relationship").

Plaintiffs' complaint claims that FWS lacks the statutory authority to terminate the translocation program—that Public Law 99-625 "provides no authority to [FWS] to cease such program once it has been initiated." FWS contends that the complaint is really a facial challenge to the 1987 Final Rule, which laid out the termination criteria FWS relied on in 2012. Such a challenge would be far outside the statute of limitations. Plaintiffs, on the other hand, contend that the 2012 program termination was the operative final agency action, and that the 1987 Final Rule is relevant only because it provides FWS's authorization for the 2012 termination. This would place the 2013 complaint well within the statute of limitations.

We conclude that the operative agency action challenged is the 2012 program termination, and thus that Plaintiffs' challenge is timely. We express no opinion on the merits of Plaintiffs' underlying claims. We hold only that Plaintiffs may challenge FWS's termination of the program within six years of the *decision* to terminate the program, and were not required to bring suit within six years of the 1987 rulemaking espousing the *authority* to terminate the program. To hold otherwise would require Plaintiffs to have filed suit nearly a decade before FWS took the action that caused their injury.

The 1987 Final Rule was clearly a final agency action, but so too was the 2012 program termination. Although the 1987 Final Rule laid out the criteria through which the translocation program could be terminated at some future date, FWS did not terminate the program until 2012, when it "determined that the southern sea otter translocation program has failed to fulfill its purpose . . . ." 77 Fed. Reg. at 75,266. Although Plaintiffs cannot now challenge the 1987 Final Rule, they can challenge its application in the 2012 program termination as exceeding the agency's statutory authority. *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 904 (9th Cir. 2012) (holding that while the plaintiffs were time-barred from challenging a 1983 regulatory definition, "they can challenge [FWS's] alleged application of that definition in the 2008 Chukchi Sea regulations as exceeding the agency's statutory authority").

FWS contends that because Plaintiffs' challenge is brought against FWS's underlying authority as asserted in the 1987 Final Rule, the challenge existed at the time the Final Rule was promulgated and Plaintiffs unjustifiably waited more than 25 years to sue. We disagree. Plaintiffs did not "wait" to sue, because the issue did not become salient until

FWS actually terminated the program, in 2012. A plaintiff cannot be expected to anticipate all possible future challenges to a rule and bring them within six years of the rule's promulgation, before a later agency action applying the earlier rule leads to an injury. Though the translocation program's failure criteria were set forth in 1987, and the program faced difficulties from its inception, the "consummation" of the agency's decisionmaking process was its 2012 program termination. *See Bennett*, 520 U.S. at 178. This was the action from which "legal consequences . . . flow" from Plaintiffs' perspective. *Id.* It is this termination, not the 1987 establishment of the failure criteria, that Plaintiffs challenge. Though FWS characterizes Plaintiffs' complaint as a "facial" challenge to FWS's authority to cancel the translocation program, that argument goes to the merits of Plaintiffs' underlying action. It does not make Plaintiffs' 2013 challenge to FWS's 2012 agency action untimely.

Our cases on this topic determine the timeliness of APA challenges according to when the applicable agency action was taken. We have held that a statute of limitations may run against a plaintiff even if it is not injured until more than six years after the relevant agency action became final. *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1363 (9th Cir. 1990). In *Shiny Rock*, the Bureau of Land Management (BLM) published a 1964 Public Lands Order withdrawing certain federal lands from mineral extraction. *Id.* More than fifteen years later, a mining company applied to the BLM for a mineral patent, which the agency rejected in part because the company's claim was in the area that the Public Land Order had withdrawn from mining. *Id.* The company contended that the statute of limitations period should not begin to run until a plaintiff is injured and acquires standing.

*Id.* at 1364–66. We disagreed, holding that the statute of limitations period runs from when the agency action becomes final and is published in the Federal Register. *Id.* at 1365. We reasoned that considering standing to sue a prerequisite to the running of the limitations period would render the limitations period meaningless by extending it indefinitely. *Id.*

FWS contends that this case is analogous to *Shiny Rock*. Just as the clock started running on the mining company's claim when the BLM's land withdrawal order was published, FWS reasons, here Plaintiffs' claim that FWS lacks authority to terminate the program accrued in 1987, when FWS published the rule containing the failure criteria. We disagree. In *Shiny Rock*, the government's land withdrawal order was a prospective decision that put all interested parties on notice of an agency action. This case is different because while the 1987 Final Rule put fishing groups on notice that FWS *may* at some later date terminate the program, the operative agency action did not happen until 2012, when FWS *actually* terminated the program. Unlike the BLM's rejection of the company's mineral patent application in *Shiny Rock*, which was a straightforward application of the land withdrawal order to a particular company, the 2012 program cancellation was a generally applicable rule, published in the Federal Register, that reflected new agency decisionmaking based on the program's failure to realize its objectives. *See* 77 Fed. Reg. at 75,266. *Shiny Rock* does not foreclose Plaintiffs from reaching the merits of their 2013 APA challenge to FWS's 2012 agency action.

*Wind River Mining Corp. v. United States*, 946 F.2d 710 (9th Cir. 1991), is more analogous to this case because it involved the present application of an earlier rule that

allegedly contradicted the agency's statutory authority. In *Wind River*, the BLM published a 1979 rule in the Federal Register establishing 138 Wilderness Study Areas (WSAs) in California. *Id.* at 711. Between 1982 and 1983, a mining company staked claims within one of those areas, "WSA 243." *Id.* The company unsuccessfully sought to have the BLM declare its creation of WSA 243 invalid, on the grounds that the area was not "roadless" as required by the Federal Land Policy and Management Act of 1976. *Id.* It then filed an extraction plan in 1987, which the BLM denied, based on the land being a designated WSA. *Id.* at 712. In 1989, the company sued in federal court, challenging the BLM's refusal to declare its creation of WSA 243 invalid. The district court dismissed the challenge as untimely because the rule was promulgated ten years earlier, in 1979. *Id.* We reversed. Because the plaintiff alleged that the BLM's 1979 rule establishing WSA 243 violated its statutory authority, we recognized that subsequent final agency actions applying the 1979 rule would also allegedly exceed the agency's statutory authority. *Id.* at 715. We concluded that "a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger." *Id.* at 716.

FWS contends that *Wind River* is inapposite to this case. It is true that this case does not concern the validity of a regulation as applied to a specific challenger; the 2012 program cancellation is instead a generally applicable agency rule. But *Wind River* is otherwise analogous to this dispute. As in *Wind River*, Plaintiffs seek to challenge a recent agency action applying an earlier rule. As in *Wind River*, Plaintiffs contend that the earlier rule went beyond the agency's statutory authority, and thus that the agency lacked the

statutory authority to take the recent action. Finally, it is the recent action, not the earlier rule, that caused Plaintiffs' injury. While an injury creating standing to sue is not a prerequisite to the running of the limitations period, *see Shiny Rock*, 906 F.2d at 1365, here Plaintiffs point to a recent and independent agency action causing their injury. FWS may well defend its 2012 cancellation as a straightforward application of the 1987 Final Rule's failure criteria, but that application was nonetheless a final agency action, with its own limitations period beginning in 2012.

The justification for the *Wind River* rule is that an agency should not be able to sidestep a legal challenge to one of its actions by backdating the action to when the agency first published an applicable or controlling rule. If the operative dispute does not arise until decades later, when the agency applies the earlier rule, such a holding would wall off the agency from any challenge on the merits. The statute of limitations would cease to be a shield against stale claims, and would instead become a sword to vanquish a challenge like the case here, without ever considering the merits. The claim in *Wind River* was not untimely, because the agency applied its 1979 rule to the plaintiff mining company in 1987, within six years of the company's suit. Neither is Plaintiffs' claim in this case, as FWS did not apply the termination criteria from the 1987 Final Rule until 2012, when it terminated the translocation program.

Another justification for our *Wind River* holding was that "no one was likely to have discovered that the BLM's 1979 designation of [WSA 243] was beyond the agency's authority until someone actually took an interest in that particular piece of property, which only happened when [the company] staked its mining claims." *Wind River*, 946 F.2d at 715. FWS

contends that this justification for the *Wind River* rule is absent in this case, because Plaintiffs do not contend that no one was likely to have discovered the 1987 Final Rule; to the contrary, the fishing industry was an active participant in the rulemaking process. That fisheries groups, some of whom are Plaintiffs here, knew about the 1987 Final Rule and were involved in its creation is immaterial. Plaintiffs are not contending that the Final Rule evaded their scrutiny. They are contending, correctly, that their live dispute with FWS did not arise until 2012.

Our decision is also supported by pragmatic concerns. If parties had to challenge the Final Rule's termination criteria within six years of 1987, then any such challenge predating the program's termination would necessarily have been theoretical. In view of the actual termination, it is possible to focus on issues such as injury in a concrete way.

### III

Plaintiffs contend that Public Law 99-625 gave FWS the authority to establish a sea otter translocation program, but not the authority to cease that program once it has been initiated. They contend that when FWS published its 2012 rule terminating the translocation program, it acted without authority from Congress, and thus contrary to law and in excess of its statutory authority. *See* 5 U.S.C. § 706(2)(A), (C). Our holding does not reach the merits of this claim, because the district court dismissed it on timeliness grounds. We hold only that Plaintiffs' 2013 challenge to the 2012 agency action terminating the sea otter translocation program was timely. The district court on remand should decide if there is merit to Plaintiffs' position that FWS was without

Congressional authority to terminate the translocation program.

**REVERSED AND REMANDED.**