**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA SEA URCHIN COMMISSION; CALIFORNIA ABALONE ASSOCIATION; COMMERCIAL FISHERMEN OF SANTA BARBARA, *Plaintiffs-Appellants*, | No. 15-56672 D.C. No. 2:14-cv-08499-JFW-CW |

v.

MICHAEL BEAN, in his official capacity as Acting Assistant Secretary for Fish & Wildlife & Parks, Department of Interior; DEPARTMENT OF INTERIOR; DANIEL M. ASHE, in his official capacity as Director of the United States Fish & Wildlife Service; UNITED STATES FISH & WILDLIFE SERVICE,
             *Defendants-Appellees*,

and

CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ENVIRONMENTAL DEFENSE CENTER; FRIENDS OF THE SEA OTTER; HUMANE SOCIETY OF THE UNITED STATES; LOS ANGELES WATERKEEPER; THE OTTER PROJECT,
       *Intervenor-Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

| | |
|---|---|
| CALIFORNIA SEA URCHIN COMMISSION; CALIFORNIA ABALONE ASSOCIATION; CALIFORNIA LOBSTER AND TRAP FISHERMEN'S ASSOCIATION; COMMERCIAL FISHERMEN OF SANTA BARBARA, *Plaintiffs-Appellants*,<br><br>v.<br><br>RACHEL JACOBSON, in her official capacity as Acting Assistant Secretary for Fish and Wildlife & Parks, Department of Interior; U.S. DEPARTMENT OF THE INTERIOR; DANIEL M. ASHE, in his official capacity as Director of the United States Fish and Wildlife Service; UNITED STATES FISH AND WILDLIFE SERVICE, *Defendants-Appellees*,<br><br>FRIENDS OF THE SEA OTTER; HUMANE SOCIETY OF THE UNITED STATES; DEFENDERS OF WILDLIFE; CENTER FOR BIOLOGICAL DIVERSITY; THE OTTER PROJECT; ENVIRONMENTAL DEFENSE CENTER; LOS ANGELES WATERKEEPER, *Intervenor-Defendants-Appellees.* | No. 17-55428<br><br>D.C. No. 2:13-cv-05517-DMG-CW<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted December 4, 2017
Pasadena, California

Filed March 1, 2018

Before:  Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Lawrence L. Piersol,[*] District Judge.

Opinion by Judge Gould

---

[*] The Honorable Lawrence L. Piersol, United States District Judge
for the District of South Dakota, sitting by designation.

SUMMARY**

**Environmental Law**

The panel affirmed the district courts' decisions in favor of the U.S. Fish and Wildlife Service in consolidated cases brought by fishing industry groups challenging the Service's decision to end a 1987 sea otter translocation program.

Pursuant to discretionary authority granted by Congress, Public Law 99-625, the Service created an experimental reserve population of southern sea otters some distance from the main population. In 2012, the Service deemed the program a failure and terminated it. The district courts held that the Service's interpretation of the statute allowing termination was reasonable, and upheld the decision to end the program.

The panel held that the plaintiffs had standing. The panel rejected plaintiffs' contention that they had standing due to the potential liability that they faced due to the elimination of exemptions for incidental takes in the management zone because plaintiffs did not allege a concrete and particularized harm. The panel held that plaintiffs *did* allege a concrete and particularized harm based on the harms they suffer because of sea otter predation of shellfish.

On the merits, the panel held that the Service acted lawfully in terminating the translocation program in 2012 because it was based on a reasonable interpretation of the

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

statute. The panel further held that in the circumstances here, where the agency had discretion to implement an experimental program, the agency could reasonably interpret the statute to allow it to terminate that program if the statute's purpose was no longer being served. The panel rejected plaintiffs' argument that the Service's interpretation raised a serious constitutional question and should be rejected on constitutional avoidance grounds. Specifically, the panel rejected plaintiffs' argument that the statute did not provide any criteria to guide a decision on termination of the program, and that the Service's interpretation would therefore violate the non-delegation doctrine. Finally, the panel rejected plaintiffs' contention that a 1994 amendment to the Marine Mammal Protection Act, relaxing restrictions on incidental takes, supported their view.

---

## COUNSEL

Jonathan Wood (argued), Pacific Legal Foundation, Arlington, Virginia; M. Reed Hopper, Damien M. Schiff, and Johanna B. Talcott, Pacific Legal Foundation, Sacramento, California; for Plaintiffs-Appellants.

Rachel E. Heron (argued), Alison C. Finnegan, John L. Smeltzer, Andrew Mergen, and Matthew Littleton, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C.; Lynn Cox and Kerry O'Hara, Office of the Solicitor, Pacific Southwest Region, United States Department of the Interior, Sacramento, California; for Defendants-Appellees.

Andrea A. Treece (argued) and Irene V. Gutierrez, Earthjustice, San Francisco, California; Margaret M. Hall (argued) and Linda Krop, Environmental Defense Center, Santa Barbara, California; for Intervenor-Defendants-Appellees.

**OPINION**

GOULD, Circuit Judge:

In these consolidated cases, several fishing industry groups challenge the U.S. Fish and Wildlife Service's ("Service") decision to end a 1987 sea otter translocation program. The program was established under discretionary authority granted by Congress in 1986 to create an experimental reserve population of southern sea otters some distance from the main population. If the Service exercised its discretion to establish the program, Public Law 99-625 required the creation of a management zone surrounding the experimental population in which liability under the Marine Mammal Protection Act and Endangered Species Act would be relaxed. The law also required the Service to use "feasible non-lethal means" to remove wayward sea otters from this management zone. As part of its 1987 rule establishing the experimental translocation program, the Service adopted specific criteria by which the program would be deemed a failure and terminated. In 2012, the Service determined that the failure conditions had been met and it ended the program. The fishing industry groups sued in two separate federal district court cases, alleging that the Service exceeded its statutory authority by terminating the program. Both district courts held that the Service's interpretation of the statute as allowing the failed program to be terminated was reasonable, and under the *Chevron*

doctrine upheld the Service's decision to end the translocation program. We affirm.

# I

The southern sea otter, or California sea otter, was hunted to near extinction in the 1700s and 1800s for its fur, and was listed as an endangered species in 1977 under the Endangered Species Act ("ESA"). *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1047 (9th Cir. 2016). In 1982 the Service prepared a recovery plan for the sea otter. Under the plan a new colony would be created far enough away from the parent population so that an environmental catastrophe like an oil spill would not endanger the entire species. *Id.*; 52 Fed. Reg. 29,754 (Aug. 11, 1987). Concerned with whether it had sufficient authority to carry out the plan, the Service asked Congress to extend its powers. In 1986 a responsive Congress passed Public Law 99-625, which clearly authorized the Service's implementation of its plan for the relocation and management of otters. *Cal. Sea Urchin Comm'n*, 828 F.3d at 1047. The correct interpretation of this law is the subject of this litigation and the appeals before us.

The relevant parts of Public Law 99-625 are set forth below:

Section 1(b) states:

> PLAN SPECIFICATIONS. — The Secretary may develop and implement, in accordance with this section, a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location. The plan, which must be developed by regulation and

administered by the Service in cooperation with the appropriate State agency, shall include the following:

> (1) The number, age, and sex of sea otters proposed to be relocated.

> (2) The manner in which the sea otters will be captured, translocated, released, monitored, and protected.

> (3) The specification of a zone (hereinafter referred to as the "translocation zone") to which the experimental population will be relocated. The zone must have appropriate characteristics for furthering the conservation of the species.

> (4) The specification of a zone (hereinafter referred to as the "management zone") that —

>> (A) surrounds the translocation zone; and

>> (B) does not include the existing range of the parent population or adjacent range where expansion is necessary for the recovery of the species.

The purpose of the management zone is to (i) facilitate the management of sea otters and the containment of the experimental

population within the translocation zone, and (ii) to prevent, to the maximum extent feasible, conflict with other fishery resources within the management zone by the experimental population. Any sea otter found within the management zone shall be treated as a member of the experimental population. The Service shall use all feasible non-lethal means and measures to capture any sea otter found within the management zone and return it to either the translocation zone or to the range of the parent population.

(5) Measures, including an adequate funding mechanism, to isolate and contain the experimental population.

(6) A description of the relationship of the implementation of the plan to the status of the species under the Act and to determinations of the Secretary under section 7 of the Act.

Section 1(c)(2) states:

For purposes of section 7 of the Act, any member of the experimental population shall be treated while within the management zone as a member of a species that is proposed to be listed under section 4 of the Act. Section 9 of the Act applies to members of the experimental population; except that any incidental taking of such a member during the course of an otherwise lawful activity within the management zone, may not be treated as

a violation of the Act or the Marine Mammal Protection Act of 1972.

Section 1(d) states:

IMPLEMENTATION OF PLAN. — The Secretary shall implement the plan developed under subsection (b) —

(1) after the Secretary provides an opinion under section 7(b) of the Act regarding each prospective action for which consultation was initiated by a Federal agency or requested by a prospective permit or license applicant before April 1, 1986; or

(2) if no consultation under section 7(a)(2) or (3) regarding any prospective action is initiated or requested by April 1, 1986, at any time after that date.

In 1987, under the authority granted by Public Law 99-625, the Service adopted a final rule implementing the translocation program and designating San Nicolas Island as the home for the experimental population. 52 Fed. Reg. 29,754 (Aug. 11, 1987). The fishing industry was opposed to the translocation program because sea otters prey on commercially valuable shellfish populations, and because the industry could face liability under the Marine Mammal Protection Act ("MMPA") and the ESA for incidental takes of southern sea otters. *Cal. Sea Urchin Comm'n*, 828 F.3d at 1047. Because of these concerns, Public Law 99-625 required the Service to adopt a management zone surrounding the experimental population in which fishermen who incidentally harmed otters would be exempt from

liability under the MMPA and ESA. 52 Fed. Reg. 29,787 (Aug. 11, 1987). Public Law 99-625 also required the Service to use "feasible non-lethal means" to capture and remove otters from the management zone "to prevent, to the maximum extent feasible, conflict with other fishery resources." Public Law 99-625 § (1)(b). The Service adopted a management zone that extended north to Point Conception, west by northwest of Santa Barbara. 52 Fed. Reg. 29,782 (Aug. 11, 1987).

The 1987 final rule, however, recognized that the experimental population might not thrive, and that the purpose of the translocation program might not be realized. For that reason, the 1987 final rule included five specific "failure conditions," any one of which would be a basis for ending the program, including its management zone liability exemptions and the Service's attempts to use feasible non-lethal means to remove otters from the management zone. 52 Fed. Reg. 29,784 (Aug. 11, 1987).

Unfortunately, the San Nicolas population never took off and there never developed a viable independent colony that could continue if an oil spill or other environmental disaster were to threaten the main colony. A 2012 assessment put the population at about fifty otters, a number insufficient to achieve the program's purpose. 77 Fed. Reg. 75,278 (Dec. 19, 2012). In 2009, Friends of the Sea Otter and other environmental organizations sued the Service for unreasonable delay in terminating the translocation program. *Cal. Sea Urchin Comm'n*, 828 F.3d at 1048. The parties reached a settlement requiring the Service to issue a final decision on program termination by the end of 2012. *Id.* That year, the Service determined that one of the failure conditions in the 1987 rule had been satisfied, and it ended the program, thereby eliminating any exemptions from

incidental take liability and any future capture and release activities.  77 Fed. Reg. 75,266 (Dec. 19, 2012).

## II

The California Sea Urchin Commission and several fishing industry groups ("the plaintiffs") first filed a suit in July 2013 challenging the Service's 2012 decision to terminate the relocation program.  In March of 2014, the district court dismissed the plaintiffs claim as untimely.  *Cal. Sea Urchin Comm'n v. Jacobson*, No. CV 13-05517, 2014 U.S. Dist. LEXIS 34445, at \*26 (C.D. Cal. Mar. 3, 2014). That decision was appealed, and in July 2016, we reversed and remanded, holding that the time to challenge the agency action ran from the 2012 decision to end the program rather than from the 1987 adoption of the failure conditions.  *Cal. Sea Urchin Comm'n*, 828 F.3d at 1052.  On remand, the district court found that the plaintiffs had standing, but that at *Chevron* step two the Service's interpretation of the statute was reasonable.  *Cal. Sea Urchin Comm'n v. Bean*, 239 F. Supp. 3d 1200, 1209 (C.D. Cal. 2017).  The court thus granted the Service's motion for summary judgment.  *Id.* at 1210.

While the prior appeal of the original case was pending, the plaintiffs petitioned the Department of the Interior and the Service to rescind the portions of the 1987 regulation establishing failure criteria, and the 2012 rule terminating the translocation program.  The Service denied the petition, and the plaintiffs brought a new suit.  In September 2015, a different district court granted summary judgment for the Service, both on grounds that the plaintiffs lacked standing, and on grounds that the Service's interpretation of the statute was reasonable at *Chevron* step two.  *Cal. Sea Urchin Comm'n v. Bean*, No. CV 14-8499, 2015 U.S. Dist. LEXIS 136453, at \*18, \*31 (C.D. Cal. Sept. 18, 2015).

In both of these consolidated cases we are asked to address two questions: whether the plaintiffs have standing, and whether the Service's decisions to terminate the translocation program was allowed under Public Law 99-625.

## III

We review a grant of summary judgment and rulings on standing and statutory interpretation *de novo*.  *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1224 (9th Cir. 2010); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018).  Under the Administrative Procedure Act, an agency decision will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001) (internal quotation marks omitted).  But, on questions of statutory interpretation we apply the deferential two-step test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

## IV

In order to have standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Here, the plaintiffs present two different theories of standing.  First, they contend that they have standing because

of the potential liability that they face due to the elimination of exemptions for incidental takes in the management zone. Second, they argue that they have standing because the otters prey on commercially valuable shellfish, thereby harming their business interests.

## A

The plaintiffs' first theory—that they face an increased risk of liability because of the elimination of exemptions for incidental takes in the management zone—fails because it does not allege a concrete and particularized harm. We have held that to show a concrete and particularized harm a plaintiff must do more than allege a potential risk of prosecution. A plaintiff must show that there is a "genuine threat of imminent prosecution." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006) (quoting *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)). In assessing whether a threat of prosecution is "genuine," courts considers three factors: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Id.* (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)).

Here, the plaintiffs offer declarations from persons working in the fishing industry. At bottom, however, these declarations do not point to any concrete degree of risk, or show that liability is likely. They do not allege that the Service has issued any warning or threat, nor do they allege any past prosecutions for incidental takes of southern sea otters. This is not enough to establish a "genuine" threat of prosecution.

The plaintiffs also offer a different line of argument for why the threat of prosecution is enough to grant them standing. Specifically, they claim that they have standing as the objects of regulation. And they claim that the object of a regulation is presumed to have standing. In support of this claim they cite *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) and *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967). These cases, however, do not support the plaintiffs' broad conclusion. In both cases, the challenged regulation imposed a clear burden on the plaintiff. In *L.A. Haven Hospice*, a hospital was required to repay $2.3 million it had received in excess of the annual cap on reimbursement for hospice care. 638 F.3d at 649. In *Abbott Labs*, the agency imposed specific labeling requirements on drug manufacturers. 387 U.S. at 138. The Supreme Court held that the plaintiffs had standing because the regulation was "directed at them in particular," and "require[d] them to make significant changes in their everyday business practices." *Id.* at 154.

Here, in contrast, the regulations do not require any particular change in the fishing industry's practices. And the plaintiffs have pointed to no specific cost that they must bear because of the increased risk of liability for incidental takes of otters. Properly understood, *L.A. Haven* and *Abbot Labs* do not create an exception to the requirement that a party for standing must show a concrete and particularized injury, or the rule that mere fear of prosecution is not enough for standing. Rather, these cases simply demonstrate that where an agency imposes concrete and particular burdensome requirements on a party—e.g. paying over $2.3 million dollars, or adopting specific labeling requirements—a party will have standing.

**B**

The plaintiffs' second theory of standing is based on the harms they suffer because of sea otter predation of shellfish. Here the plaintiffs have alleged a concrete and particularized harm. For instance, one declarant states that sea otter predation has significantly reduced shellfish populations between Point Conception and Santa Barbara (an area within the management zone). Another alleges that otters have substantially reduced the shellfish populations between Gaviota and Government Point (also within the management zone).

The Service contends that the plaintiffs lack standing because the harm to shellfish populations will not be redressed by the relief sought. At most, it claims, a favorable decision for the plaintiffs would require the Service to revisit its independent decision in 1993 to cease capture and release operations because there were no feasible non-lethal means to remove sea otters from the management zone. *See* 77 Fed. Reg. 75,269 (Dec. 19, 2012); Public Law No. 99-625, § (1)(b). And the Service contends that it is likely to come to the same conclusion if it reconsiders that decision. We have held that in order to have standing a plaintiff need not show that the requested relief will inevitably alleviate the harm complained of. Where there are legal impediments to the recovery sought, it is enough for standing that the relief sought will remove some of those legal roadblocks, even if others may remain. *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012). Here, if the translocation program is reinstated, one substantial legal roadblock will be removed. We hold that the plaintiffs have standing based on the alleged harm to shellfish populations.

## V

On the merits, we consider whether the Service acted lawfully in terminating the translocation program in 2012. The plaintiffs contend that the Service's creation of the management zone, its obligation to use feasible non-lethal means to remove otters from the management zone, and the exemption from incidental take liability within the management zone became mandatory once the relocation project was started; having started the program, the Service had no authority to end it.  Under the plaintiff's theory the program would have to go on forever absent new congressional action.   We disagree.   For the reasons explained below, we hold that the Service's decision to terminate the program was based on a reasonable interpretation of the statute, and was therefore lawful.[1]  We affirm both district court decisions on the merits.

## A

In its 1987 regulations implementing Public Law 99-625, the Service specified several "failure" conditions for the program.  These failure conditions set criteria for assessing when the relocation program would be deemed unsuccessful and terminated.    Under the regulations, if a failure determination was made the Service would terminate the experimental population (i.e. end the program), make reasonable efforts to capture healthy otters remaining in the translocation zone and management zone, and return them to the parent population.  52 Fed. Reg. 29,784 (Aug. 11, 1987).

---

[1] The parties do not challenge the Service's determination that the failure conditions were satisfied.

At issue is whether the Service's decision to terminate the program exceeded the authority given to it under Public Law 99-625. All parties agree that this question should be assessed under the two-step *Chevron* analysis. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–44 (1984). Under that test a court first asks whether Congress has spoken to the precise question at issue. If so, that is the end of the matter. *Id.* at 842–43. Otherwise, the court asks whether the agency's interpretation of the statute is a permissible. *Id.* at 843. "An agency interpretation that enjoys *Chevron* status must be upheld if it is based on a reasonable construction of the statute." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1143 (9th Cir. 2007).

The plaintiffs contend that the statutory language clearly speaks to the issue at hand, and is unambiguous. They claim that Public Law 99-625 gives the Service discretion in deciding whether to implement the program, but once implemented requires the Service to maintain the program's features indefinitely, including the management zone, removal of otters from that area, and exemption from liability for incidental takes of southern sea otters in the area. In support of this conclusion, they point to some scattered mandatory language in the statute. Section 1(b) of Public Law 99-625 says that the translocation plan "shall include" a specified management zone. And section 1(d) says that the Secretary "shall implement" the plan after providing an opinion under section 7(b) of the ESA that addresses consultations initiated before April 1, 1986, or if no such consultations are initiated, at any time thereafter. This mandatory language, the plaintiffs claim, requires the conclusion that the program cannot be terminated once it has been instituted.

In contrast, the Service counters that the statute gives it discretion to develop and implement the plan, and that the plan is styled as "experimental." *See* Public Law 99-625 § 1(b). The Service also notes that the statute provides broad discretion to prescribe the specifics of the plan. For example, it lets the Service determine how many otters would be relocated, what area would be appropriate as a management zone and what additional policies to adopt as a result of notice and comment rulemaking. *Id*. These discretionary provisions, the Service argues, support the conclusion that the Service has clear statutory authority to terminate the program. Hence, it contends that its interpretation is compelled at *Chevron* step one.

Public Law 99-625, however, does not either expressly require the Service to operate the translocation program in perpetuity or expressly grant authority to the Service to terminate the program. It does not speak to the issue of termination at all. Because "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

At *Chevron* step two we hold that it is reasonable to interpret the statute as implicitly giving the Service authority to terminate the program when it determines that the purposes of the statute would no longer be served, or when its continuation would be at odds with the goals of the ESA or the MMPA. The statute itself makes repeated references to the ESA. For instance, Public Law 99-625 tells the Secretary to include, as part of a plan, a "description of the relationship of the implementation of the plan to the status of the species under [the ESA] and to determinations of the Secretary under section 7 of [the ESA]." Public Law 99-625

§ 1(b)(6).  Section 7 of the ESA requires the Secretary to ensure that agency actions are in harmony with the protection of endangered and threatened species.  16 U.S.C § 1536.  Given this language, it is reasonable for the Service to interpret the provisions of Public Law 99-625 as authorizing it to act in harmony with the goals of the ESA. Terminating the failed translocation program is in keeping with this authority.   The plaintiffs' interpretation, by contrast, would require the program to continue even if the Service determined that it was counter-productive and harmed, rather than protected, threatened or endangered species.  That would make no sense whatsoever.

Moreover, the statutory language suggests that the purpose of the management zone was to limit conflict between the fishing industry and the translocated otters around San Nicolas Island.  The zone was not intended to limit expansion of the northern parent population.  *See* Public Law 99-625 § 1(b) ("The purpose of the management zone is to (i) facilitate the management of sea otters and the containment of the *experimental population within the translocation zone*, and (ii) to prevent, to the maximum extent feasible, conflict with other fishery resources within the management zone *by the experimental population*." (emphasis added)).  In light of the statute's focus on the experimental population, it is reasonable for the Service to end the program once it has determined that the San Nicolas population has failed and that continuing the program now would pose a threat to the currently expanded parent population.  On the plaintiff's unwise interpretation of the statute, the Service would be required to continue the program even if no otters remained in the transplanted San Nicolas population.  That reading would have the effect of turning a statute with an express purpose of protecting otters into one that harmed otter populations where, as here, the

range of the parent population has expanded.  And that interpretation cannot be squared with the statute's stated purpose of containing the *experimental* population.

The plaintiffs interpret the Service as defending the broad principle that if the implementation of a regulation is discretionary, then the agency always has discretion to end the regulation at any time and for any reason.  Nothing requires us to adopt this broader principle, and we are skeptical that such a principle would be sound.  Rather, we hold only that in the circumstances here, where the agency has discretion to implement an experimental program, it can reasonably interpret the statute to allow it to terminate that program if the statute's purpose is no longer being served.  And it follows with stronger logic that termination is permissible at the agency's discretion if the agency concludes that continuing the program would undermine the stated purpose of the statute that authorizes it.

In light of the expressly stated goals of Public Law 99-625, it is reasonable to interpret the "mandatory" language in the statute as conditioned on an ongoing successful translocation program.  The Service did not violate its statutory duties by terminating the program.  The plaintiffs' alternative reading would turn a statute aimed at preservation of the otter population into one that impedes that goal where the experimental population does not thrive.  We hold that Public Law 99-625 does not require this result.

## B

The plaintiffs also argue that the Service's interpretation raises a serious constitutional question and so should be rejected on constitutional avoidance grounds.  Specifically, the plaintiffs argue that the statute does not provide any criteria to guide a decision on termination of the program,

and that the Service's interpretation would therefore violate the non-delegation doctrine. We reject this argument because it is unconvincing. As the Supreme Court held in *Whitman v. American Trucking Associations*, to survive constitutional scrutiny under the non-delegation doctrine a statute need provide only an intelligible principle for promulgating associated regulations. 531 U.S. 457, 472 (2001). And as the *Whitman* court explained, an intelligible principle can still be somewhat vague without offending the Constitution. *Id.* at 473–74 (citing cases). Here, Congress has given substantial guidance to the agency. Public Law 99-625 instructs the agency to institute a translocation zone "with appropriate characteristics for furthering the conservation of the species" and it announces specific purposes for the management zone—to contain otters in the translocation zone and to prevent conflict (to the extent feasible) with fisheries. Public Law 99-625 § 1(b). The statute also instructs the Service to use only feasible non-lethal means to relocate otters. It is evident that the statute has two guiding principles: (1) a concern to protect and preserve a threatened species and (2) a concern to minimize unnecessary conflict with fisheries arising from the experimental population.

The plaintiffs are mistaken in believing that this guidance only relates to the institution of the management zone and that there is no guidance relating to the elimination of that zone once established. The plaintiffs have given no reason to think that these same criteria do not apply equally to both a decision to implement the program and a decision to end it. Looking at the language of the statute and the broader statutory scheme, it is clear that agency decisions regarding both the implementation and termination of a relocation program should be guided by considerations of otter conservation, and avoidance of conflict between the

experimental population and fisheries. That is more than enough to pass constitutional muster, and there is no serious constitutional question to avoid here. *See Whitman*, 531 U.S. at 474–75 ("[W]e have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." (citation and internal quotation marks omitted)).

## C

The plaintiffs also contend that a 1994 amendment to the Marine Mammal Protection Act relaxing restrictions on incidental takes supports their view. *See* 16 U.S.C. § 1387(a)(4). They argue that this amendment specifically exempts southern sea otters from the relaxed restrictions on grounds that the otters are independently governed by Public Law 99-625. The effect of rescinding the 1987 regulations, they urge, is to make sea otters subject to the baseline MMPA rules, which, the plaintiffs assert, are less lenient with regard to incidental takes. The plaintiffs contend that this could not be allowed under the statutory scheme, since that gives otters more protections than it gives other marine mammals, whereas Public Law 99-625 clearly contemplates that they will have fewer protections, at least within the management zone.

This argument is unconvincing. The termination conditions were established in 1987, seven years before the MMPA's amendment. Hence, Congress was on notice that the agency interpreted Public Law 99-625 to allow termination of the program. Yet Congress left things in place, specifically providing that the amendment "shall not be deemed to amend or repeal [Public Law 99-625]." 16 U.S.C. § 1387(a).

**VI**

For the reasons set forth above, we affirm both district courts' conclusions that the Service acted lawfully in terminating the southern sea otter relocation program authorized by Public Law 99-625.

**AFFIRMED.**